# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SHAWNTE ANNE LEVY, *a/k/a*
EL SOUDANI EL WAHHABI,
*Prisoner Identification No. 416369,*

      Plaintiff,

      v.

WEXFORD MEDICAL SOURCES, INC.;
FRANK B. BISHOP, WARDEN; and
GREGG L. HERSHBERGER,
COMMISSIONER;

      Defendants.

Civil Action No. TDC-14-3678

## MEMORANDUM OPINION

Plaintiff Shawnte Anne Levy, previously known as El Soudani El Wahhabi, is currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. Levy has been diagnosed with Gender Dysphoria ("GD"), formerly referred to as Gender Identity Disorder, a condition under which a person feels strongly that he or she is not the gender of his or her birth. Levy[1] filed a Complaint under 42 U.S.C. § 1983 against former Division of Correction Commissioner Gregg L. Hershberger;[2] NBCI Warden Frank Bishop (collectively, the "Correctional Defendants"); Wexford Health Sources, Inc. ("Wexford"), the health care provider under contract to provide certain medical services to Maryland state prisoners; and the Maryland

---

[1]    Because Levy identifies as female, the Court will use the feminine pronoun to refer to her.

[2]    Dayena Corcoran has replaced Hershberger as the Commissioner of the Division of Correction.

Department of Public Safety and Correctional Services ("DPSCS"), which has since been dismissed as a defendant. Levy alleged several causes of action, the only remaining of which is her allegation that Defendants violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution and under the Maryland Declaration of Rights by not providing her with hormone therapy and psychotherapy as treatment for GD.[3]  In a March 7, 2016 Memorandum Opinion and Order resolving Defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment and Levy's Motion for Partial Summary Judgment, the Court found that Levy's claim for GD treatment was likely moot because Defendants conceded that Levy was entitled to treatment. In an abundance of caution, the Court instituted a six-month monitoring period to ensure full implementation of that treatment. That compliance period has ended, and Defendants have each filed a renewed Motion for Summary Judgment. Also pending are Levy's Motion to Appoint Counsel, her Motion to Amend the Complaint, her Motion for a Preliminary Injunction, and her Motion for Partial Summary Judgment. Having reviewed the parties' submissions, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Wexford's Motion for Summary Judgment is granted, the Correctional Defendants' Motion for Summary Judgment is granted, Levy's Motion to Appoint Counsel is denied, her Motion to Amend the Complaint is denied, her Motion for a Preliminary Injunction is denied, and her Motion for Partial Summary Judgment is denied.

---

[3]  The Maryland Declaration of Rights is *in pari materia* with the United States Constitution and its Amendments. *See Evans v. State*, 914 A.2d 25, 67 (2006) (stating that the parallel provisions of the Maryland Declaration of Rights should not be "read more broadly (or narrowly)" than the Eighth and Fourteenth Amendments to the U.S. Constitution). Levy's Maryland Declaration of Rights claim thus essentially folds into her federal constitutional claims. For ease of reference, the Court discusses Levy's claims only in the federal constitutional context.

## BACKGROUND

The prior factual background of this case is set forth in the Court's March 7, 2016 Memorandum Opinion. *Levy v. Wexford*, No. TDC-14-3678, 2016 WL 865364 at *1-3 (D. Md. Mar. 7, 2016). The Court therefore summarizes such background as necessary and sets forth subsequent facts and procedural history relevant to the pending Motions.

Shortly after her arrival at NBCI in September 2013, Levy informed prison medical staff that she suffered from GD and asked for treatment. She was refused. Medical staff told her that NBCI had no record of any GD diagnosis such that, under DPSCS policy, she would receive no treatment. That policy was contained in a February 22, 2012 DPSCS Office of Clinical Services/Inmate Health Services Medical Evaluations Manual, in effect at the time Levy entered NBCI, and stated that DPSCS will provide transgender treatment only to inmates who have either a transgender diagnosis prior to entering the prison or prior enrollment in a certified transgender program. Wexford, as the primary medical contractor to DPSCS prisons, is contractually obligated to follow DPSCS policy.

On March 24, 2014, Levy filed a Request for Administrative Remedy under the Administrative Remedy Procedure ("ARP") in which she asserted that she had been diagnosed with GD prior to her incarceration at NBCI and asked to receive estrogen hormone therapy and transgender counseling for her condition. She also asked to be allowed to wear women's clothing, to wear makeup, and to shave three times a week. The ARP was denied the next day as frivolous. Levy appealed that denial to the Inmate Grievance Office ("IGO"). On December 8, 2014, the IGO instructed Levy to provide within 30 days the medical records substantiating her claims of a GD diagnosis. Levy failed to submit any records, so the IGO administratively closed her appeal. That IGO appeal was the only one filed by Levy in 2014.

Meanwhile, on November 20, 2014, Levy filed suit in this Court alleging that she was receiving constitutionally inadequate treatment for her GD and seeking injunctive relief in the form of hormone therapy and psychotherapy. Levy attached her original ARP to her Complaint. At some point in May 2015, DPSCS received copies of Levy's mental health records from the Clifton T. Perkins Hospital Center, a psychiatric hospital where she had previously been confined. Those records confirmed that Levy had been diagnosed with GD prior to her incarceration at NBCI. As a result, Levy, in accordance with prison policy, was sent to a University of Maryland endocrinologist for an evaluation to begin hormone treatment. On January 28, 2016, Levy was placed on a hormone treatment plan consisting of the provision of spironolactone and estradiol.

With the start of Levy's treatment for GD, the Wexford and the Correctional Defendants moved for dismissal or summary judgment, arguing primarily that Levy's claims were moot. Levy opposed those Motions, asserting that although she had been prescribed hormone therapy, she was not yet reliably receiving her treatment. In a March 7, 2016 Memorandum Opinion, this Court concluded that dismissal of Levy's claims on the basis of mootness was premature and thus denied the motions without prejudice to renewal at the end of a six-month compliance period. The Court ordered Defendants during that six-month compliance period to provide status reports every 60 days, to which Levy would be permitted to respond.

In the first of those three reports, submitted in May 2016, Defendants provided records establishing that as of February 25, 2016, Levy was regularly receiving hormone therapy, with only a handful of missed doses. Specifically, she was receiving a daily dose of 50 milligrams of spironolactone and was receiving 0.1 milligram transdermal patches of estradiol twice a week. On April 14, 2016, Levy had another appointment with a University of Maryland

endocrinologist, who observed that, as a result of the hormone therapy, Levy had begun to develop breasts. At an April 26, 2016 appointment at NBCI, the provider requested authorization for a follow-up appointment with the endocrinologist in three months. At some point prior to May 6, 2016, Levy received female undergarments. Throughout this period, Levy received mental health treatment for her GD.

In her response to Defendants' reports, Levy did not dispute that she had been receiving hormone treatment and women's undergarments. She did, however, assert that in April 2016, she submitted a written request to be allowed to have makeup but had not yet received a response.

In the second report, filed in July 2016, Defendants noted that on May 6, 2016, Levy's laboratory results were sent to her endocrinologist. Those results showed that Levy's estrogen level had increased and her testosterone level had decreased. On May 11, 2016, prison medical staff reviewed those results with Levy. At a May 24, 2016 appointment at NBCI, Levy asked to have her estrogen dose increased. Medical staff informed her that her laboratory results had been sent to her endocrinologist, who had not yet provided updated treatment recommendations. On May 31, 2016, Levy again went to prison medical services asking for her estrogen dose to be increased, expressing disappointment with how long her gender transition was taking. Medical staff explained that transgender treatment is a slow process. On June 10, 2016, Levy's endocrinologist acknowledged receipt of Levy's test results and instructed Wexford to continue Levy's hormone treatment at the same levels. Throughout this period, Levy regularly received both hormone treatment and mental health treatment.

In her response to Defendants' report, Levy did not dispute that she had been receiving hormone treatment as prescribed, but asserted that she was not provided with certain mental health and psychiatric records as part of Defendants' report.

In the third report, filed in September 2016, Defendants noted that Levy was seen by her endocrinologist on July 14, 2016 for her three-month follow up appointment. Based on that visit, Levy's hormone doses were doubled to 100 milligrams of spironolactone daily and 0.2 milligram transdermal patches of estradiol twice a week. On July 21, 2016, Wexford updated Levy's prescriptions accordingly. Levy was instructed to get blood work done in six weeks and to return for a follow-up appointment in three to four months. During this period, Levy received all prescribed hormone medications and continued to receive mental health treatment for her GD. At one of those mental health appointments, she expressed her eagerness for sex-reassignment surgery.

On August 15, 2016, DPSCS issued a revised policy on the treatment of inmates with GD. That policy commits DPSCS not only to the treatment of inmates diagnosed with GD prior to incarceration, as in Levy's case and as required under the previous policy, but also to the treatment of inmates first diagnosed with GD during incarceration. As relevant here, that policy requires a GD-diagnosed inmate's prison mental health clinician to develop an initial individualized treatment plan in consultation with (1) the inmate's treating psychiatrist, (2) DPSCS's Regional Director of Mental Health, (3) any other clinicians providing relevant treatment, and (4) the Regional Treatment Team ("RTT"), which consists of the Regional Director or a designee, the Regional Psychiatrist, the Regional Medical Director, prison staff as needed, and any other medical staff as needed. That initial plan is then to be sent to the RTT for approval and, if warranted, for referral of the inmate to a specialist for treatment.

Levy submitted no rebuttal to Defendants' third status report. Instead, she submitted a Motion for Partial Summary Judgment in which she confirmed that she has been receiving her hormone therapy, that she is being allowed to wear female undergarments, and that she is being provided with regular mental health counseling. She complained, however, that she was not allowed to purchase eyeliner or a hair relaxer kit from the NBCI commissary. She also asserted that she has not yet had sex-reassignment surgery and argues that the failure of Defendants to schedule that procedure amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. In support of the latter contention, Levy asserts that on May 18, 2016, she asked to be referred to a GD specialist for a surgical consultation, but that such consultation never took place. Levy also asserts that on August 16, 2016, a member of the Wexford medical staff speculated that Levy would not receive sex-reassignment surgery.

Levy has made several additional filings, each of which will be discussed in turn. As part of those filings and Defendants' responses to them, the following additional medical history has been submitted to the Court. On October 18, 2016, Levy was examined by prison medical personnel for genital bleeding as result of her tying up her genitals. She also complained of headaches related to the change in her spironolactone dose. On November 9, 2016, Levy filed a request that this Court, pursuant to Federal Rule of Civil Procedure 35, order an examination by a GD specialist relating to sex reassignment surgery, but provided no factual basis or legal support for that request. The next day, November 10, 2016, at a visit to her endocrinologist, Levy asked that her spironolactone dose be doubled to 200 mg per day and also asked for the names of doctors who could perform sex-reassignment surgery. Levy's endocrinologist noted that Levy's estrogen levels were above the therapeutic goal but, after reviewing with Levy the risks of elevated estrogen levels, made no adjustment to the daily 100 milligrams of

7

spironolactone and twice weekly 0.2 milligram patches of estradiol that had previously been prescribed. The endocrinologist recommended that Levy continue to receive psychological counseling in tandem with her hormone therapy. The endocrinologist further recommended that Levy be referred to a urologist for an evaluation of an inguinal hernia, as well as for a possible orchiectomy, a surgical procedure to remove one or both testicles. No medical basis for the orchiectomy was noted. That urology consultation was ordered by the prison on December 5, 2016.

Following the endocrinologist's report, on December 6, 2016, Defendants convened a meeting with Levy and a number of her medical providers, including Dr. Mulugeta B. Akal, the DPSCS Regional Medical Director; Bruce Liller, her mental health counselor; and Krista Bilak, her primary Nurse Practitioner, to discuss the possibility of an orchiectomy. At that meeting, Liller suggested that any consideration of body-altering surgery be approached cautiously in light of the fact that Levy has not only GD but also schizoaffective disorder and psychosis. Liller remarked as well that Levy had been undergoing hormone therapy for only about six months, noting that literature on GD recommends that patients undergo hormone therapy for at least a year before progressing to sex-reassignment surgery. Liller suggested that the question of an orchiectomy be put before the RTT for further discussion. After a therapy session with Levy the following day, Liller noted that there was a need for a reassessment of her other mental health diagnoses based on divergences between those diagnoses and her symptoms, a need to better understand the triggers to her psychosis, and a need to further discuss the nature of sex-reassignment surgery and ensure that Levy understood that some individuals with GD obtain no relief from symptoms even after sex reassignment. Liller also increased the frequency of Levy's therapy sessions from once a month to twice a month.

On January 23, 2017, Levy filed what she titled an "Order to Show Cause for a Preliminary Injunction," which the Court construes as a Motion for a Preliminary Injunction, seeking an order requiring that Levy receive sex-reassignment surgery. In that Motion, Levy asserts that Defendants are wrongfully denying her an orchiectomy, which she characterizes as medically necessary, in violation of her Eighth Amendment right to be free from cruel and unusual punishment.

On January 31, 2017, Levy was examined by Dr. Akal, who determined that Levy's inguinal hernia was stable and treated Levy for continuing ulcerations on her penis resulting from her tying back her genitals. On February 3, 2017, Levy's RTT convened to discuss her GD treatment. After ordering another endocrinology consultation, the RTT noted that although the urological consultation requested on December 5, 2016 had been approved, the consulting physician had since stopped accepting NBCI inmates as patients. Instead of the outside consultation, the prison scheduled a January 31, 2017 onsite evaluation with Dr. Akal, who concluded that surgical repair of Levy's hernia was not necessary. As for an orchiectomy, the RTT recommended a consultation with Dr. Chris Kraft, the Director of Clinical Services for the Johns Hopkins Hospital Sexual Behaviors Consultation Unit. On March 3, 2017, DPSCS's Regional Committee on Gender Dysphoria met to discuss Levy's case and their efforts to recruit Dr. Kraft to join the Committee.

At a March 7, 2017 primary care visit, Nurse Practitioner Bilak informed Levy that her consultation with Dr. Kraft had been approved and that she had another endocrinology appointment coming up. Levy asked to be provided with sanitary napkins, explaining, when pressed, that she was continuing to tie back her genitals, which was causing bleeding. Levy was provided gauze pads and ointment, and she was cautioned about the dangers of tying her

genitals. Beginning at that appointment and over the ensuing months, Levy became increasingly insistent in her requests to prison medical staff, her mental health counselor, and her endocrinologist for an orchiectomy and sex-reassignment surgery.

After an April 27, 2017 appointment, Levy's endocrinologist recommended that Levy's estradiol dose be reduced to 0.3 milligrams per week, from 0.4 milligrams per week, based on Levy's continued high levels of estrogen. The reduction was implemented on May 3, 2017. The endocrinologist also noted that there was no medical reason that Levy could not undergo an orchiectomy, but deferred to prison policy on whether such surgery should proceed.

On May 26, 2017, Levy filed correspondence with the Court complaining about the reduction in her estradiol dose and asserting that no one had explained to her the reason for the change. In that correspondence, Levy also requested that she be given intramuscular hormone injections and contended that, despite her repeated requests, she has not been referred to a GD specialist. She also complained that she has not yet had an orchiectomy. She asserted that each of the specified medical treatments is medically necessary to treat her GD and that without the treatments she is suffering from the mental anguish caused by GD as well as physical distress arising from her reduced hormone dose. Levy again argued that Defendants' failure to provide the requested treatments violates her Eighth Amendment right to be free of cruel and unusual punishment.

That same day, Levy also filed a Motion to Amend the Complaint seeking to amend her allegations to request as relief that a special master be appointed to oversee her hormone therapy and that sex-reassignment surgery be scheduled, as well as $20,000 in damages. On July 10, 2017, Levy moved for appointment of counsel.

Defendants oppose Levy's Motion to Amend and her Motion for Partial Summary Judgment, and they have each renewed their Motion for Summary Judgment. In their Motions, Defendants assert that Levy's claims for GD treatment are moot in light of clear DPSCS policy on GD treatment and their record of providing Levy with that policy-mandated care. The Correctional Defendants also assert that they are entitled to summary judgment on Levy's claims that she was denied certain commissary items because Levy never administratively exhausted that grievance.

## DISCUSSION

### I. Motion to Appoint Counsel

Levy asks that the Court appoint counsel to represent her because she has been unable to find a private attorney willing to take her case, she has limited access to legal materials through the prison library, and her case presents complex issues of law requiring significant research. "The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2012). In civil actions, however, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (internal quotation marks and citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Inherent in this analysis is that one's

indigence is insufficient to establish exceptional circumstances. Nor do Levy's other proffered reasons show exceptional circumstances that would warrant appointment of counsel. Despite her enumerated constraints, Levy has vigorously pursued this litigation, filing multiple motions and providing evidence to support her claims. Levy has thus been able to articulate the facts of her case and her legal claims without assistance, so there are no exceptional circumstances that warrant appointment of counsel. Levy's Motion for Appointment of Counsel is denied.

## II.     Motion to Amend the Complaint

In her Motion to Amend the Complaint, Levy appears to assume that her original Complaint sought relief in the form of sex-reassignment surgery and thus seeks to amend her Complaint to request that a special master be appointed to oversee that process and that she be awarded money damages for the delay in that treatment. However, nowhere in Levy's original Complaint or her two amendments did she seek sex-reassignment surgery. The Court therefore construes Levy's Motion as a request, after three years of litigation and three previously filed versions of the Complaint, to amend her Complaint to add a claim that she is entitled to sex-reassignment surgery.

Federal Rule of Civil Procedure 15 instructs that leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts should thus deny a motion to amend only when an amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile. *Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010).

A proposed amendment is prejudicial to the opposing party if it is belated and would change the nature of the litigation. *Id.* at 604; *see Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987) ("Belated claims which change the character of litigation are not favored."). That is the situation

12

here. Levy seeks to amend her Complaint after this litigation had been pending for nearly three years, after she twice previously amended her Complaint, after the parties went through a prior round of briefing on summary judgment, after the institution and successful completion of a six-month compliance period, and after Defendants renewed their Motions for Summary Judgment. Against that long litigation history, Levy seeks to widen her suit to encompass an entirely new medical treatment, moving from medication and therapy to irreversible surgical intervention. Levy offers no explanation for her delay, instead asserting, incorrectly, that sex-reassignment surgery has been part of her claim since the outset of this litigation. Based on Levy's own understanding that her desired treatment encompassed sex-reassignment surgery, there was no reason she could not have included sex-reassignment surgery in her original claim for relief. Her attempt to alter her Complaint now is thus a belated effort. *See Deasy*, 833 F.2d at 41 (holding that the district court did not err in denying a motion to amend where the plaintiff offered no reason for the delay in filing the motion because "a motion to amend should be made as soon as the necessity for altering the pleading becomes apparent").

Because sex-reassignment surgery is a qualitatively different treatment, Levy's proposed amendment would change the character of this long-pending litigation. The proposed expanded claim would require new medical experts—as to whether such treatment is both mentally appropriate and physically viable—and would largely return this case to the starting point, because the record thus far adduced has been centered on implementation of hormone and mental health treatment. As a result, Defendants would find themselves unduly prejudiced by having "to spend additional time, money, and energy laboring in this Court's trenches," despite having fulfilled their obligations during the compliance period. *Smith v. Angelone*, 111 F.3d 1126, 1134 (4th Cir. 1997).

Levy's Motion to Amend must also be denied because it would be futile. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995); *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420–21 (4th Cir. 1990); *Glick v. Koenig*, 766 F.2d 265, 268-69 (7th Cir. 1985) ("The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures."). The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component, that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety, and a subjective component, that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that

would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* (citations omitted); *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Here, there is no dispute that Levy suffers from an objectively serious medical condition, nor is there a dispute that Levy is receiving treatment for that condition. What Levy seeks to dispute through her amendment is the nature and extent of that treatment. She asserts that proper treatment of her GD requires sex-reassignment surgery. However, Levy provides no basis for that assertion beyond her own belief in the necessity of those treatments. To date, no physician has determined that an orchiectomy is medically necessary to treat Levy's GD. Although Levy contends that an orchiectomy has been mandated by her endocrinologist, the medical records reveal that in November 2016, the endocrinologist made no determination whether Levy should have an orchiectomy, only that she should be referred to a urologist for an evaluation for that procedure, and that in April 2017, the endocrinologist determined that there was no medical contraindication to an orchiectomy—meaning that there was no medical reason that such a procedure could not be performed—not that such a procedure was medically necessary. The medical records also reveal that Levy's psychologist, relying on literature about the appropriate treatment of GD, has expressed concern that any irreversible surgical treatment at this juncture would be premature, particularly in light of Levy's other, serious psychological diagnoses of schizophrenia and psychosis. As for Levy's hormone treatment, the medical records reveal that

the endocrinologist reduced her estradiol dose because Levy's estrogen levels were elevated beyond the acceptable range.

In light of this uncontradicted evidence, Levy cannot plausibly assert that in not yet having arranged for Levy to receive sex-reassignment surgery, Defendants have subjectively known of and disregarded an excessive risk to Levy's health. *See Jackson*, 775 F.3d at 178. Rather, the undisputed record evidence establishes that in pursuing these paths, Defendants have diligently pursued treatment for Levy's GD and have acted in accordance with the recommendation of Levy's medical professionals. Indeed, her treating psychologist has cautioned against sex-reassignment surgery at this point because of Levy's other serious psychological conditions, the relatively short time she has been on hormone therapy, and the possibility that the surgery will not alleviate her feelings of dysmorphia. Although Levy may disagree with the current pace of her GD treatment, a disagreement between an inmate and a physician over proper medical care is not sufficient to show deliberate indifference. *See id.*; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Levy's proposed amendment to her Complaint would thus be futile. Levy's Motion to Amend is therefore denied.

## III. Motion for a Preliminary Injunction

In her Motion for a Preliminary Injunction, Levy asserts that Defendants are purposefully denying or delaying her sex-reassignment surgery and thereby acting with deliberate indifference to her serious medical needs. She asks that the Court enjoin them from any continued denial or delay.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the

public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Here, Levy's Motion fails at the first hurdle. For the reasons discussed above, Levy is not likely to succeed on her claim that Defendants are denying or delaying her sex-reassignment surgery as a result of deliberate indifference to her serious medical needs and in violation of her Eighth Amendment rights.[4] The Motion for a Preliminary Injunction is therefore denied.

## IV. Motions for Summary Judgment

Defendants have renewed their Motions for Summary Judgment, asserting that because Levy is receiving the hormone therapy and psychotherapy she originally sought, this case no longer presents any controversy for the Court to adjudicate. The Correctional Defendants also argue that Levy's allegations that she was denied certain commissary items must fail because Levy was required, but failed, to exhaust her claims through the prison grievance process. In her Motion for Partial Summary Judgment, Levy again argues that she is entitled to, but has not

---

[4] In her Motion for a Preliminary Injunction, Levy makes the brief assertion that Defendants are also violating her rights under the Equal Protection Clause of the United States Constitution "by treating her differently from similarly situated cisgender inmates seeking vaginoplasty." Mot. Prelim. Inj. at 5, ECF No. 111. Levy has neither pleaded an equal protection claim relating to her GD treatment nor sought to amend her Complaint to include such a claim. Because such a claim is not before the Court, Levy necessarily cannot demonstrate that she is likely to succeed on its merits. Even if such a claim were properly before the Court, Levy's Motion would still not succeed. Other than the bare assertion in the motion, Levy has made no allegations and provided no evidence that suggests that her GD treatment in any way differs from the GD treatment afforded to other inmates.

received, sex-reassignment surgery, and that she has been unable to order a hair relaxer kit and eyeliner from the commissary. Levy reiterates those complaints in her Opposition to Defendants' Motions.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49.

### A. Hormone Therapy and Psychotherapy

Defendants argue that because in her original Complaint Levy sought injunctive relief requiring that she receive hormone therapy and psychotherapy, and she is now receiving both, that claim is now moot. Article III of the Constitution limits the judicial power to "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted). A case becomes moot when the issues presented are "no longer 'live' or the

parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "A defendant claiming that its voluntary compliance moots a case bears a formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Defendants have made this showing.

It is undisputed that DPSCS policy has required that an inmate with a pre-incarceration GD diagnosis be provided treatment, and Defendants have acknowledged that they initially failed to provide that treatment to Levy because they had no record that she had been diagnosed with the condition. Although Defendants initiated that treatment in January 2016 and sought dismissal of the case as moot, the Court declined to do so and instead required Defendants, beginning in March 2016, to report on their treatment of Levy for a monitoring period of six months. During that period and in the ensuing months, Defendants assert, and the medical records substantiate, that they have consistently provided Levy with GD treatment. Although Levy complains about the recent reduction in her estradiol dose, Levy does not dispute that from early 2016 to the present, she has received consistent hormone therapy and regular psychotherapy, the two requests for relief she made in her Complaint. The uncontradicted medical records further establish that the recent reduction in Levy's estradiol dose was made at the express recommendation of Levy's endocrinologist and in response to Levy's unacceptably elevated estrogen levels.

Because Defendants concede that they were and continue to be bound to provide treatment to Levy under DPSCS policy, this case does not present the issue courts have found worrisome in voluntary cessation cases: that a defendant has only temporarily ceased an

unlawful practice or changed a policy so as to evade judicial review. *See Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017). Rather, here, Defendants acknowledge that their own policy compels the result that Levy seeks. Indeed, while in *Porter* the defendants "repeatedly . . . refused to rule out a return to the challenged policies," 852 F.3d at 360, DPSCS has actually adopted a more robust policy, issued during the pendency of this case in August 2016, that extends GD treatment to inmates diagnosed since arriving in a DPSCS facility and establishes more formal guidelines and procedures for providing such treatment. That fact, coupled with Defendants' 18-month history, during and after the Court's monitoring period, of implementing the requested hormone therapy and psychotherapy, firmly establishes that Levy's prior denial of treatment "could not reasonably be expected to recur." *See id.* at 364. Levy makes no argument to the contrary, instead focusing her opposition on additional treatments she wishes to receive, none of which were pleaded in her Complaint and none of which have been deemed medically necessary by her treating physicians. Because Defendants concede that their own policy obligates them to provide Levy treatment, and because Levy has now been receiving for over 18 months the hormone therapy and psychotherapy treatment she originally sought, the Court concludes that this case presents no active controversy for adjudication and is thus moot. Defendants' Motions for Summary Judgment are granted. In turn, Levy's Motion for Partial Summary Judgment is denied as to Defendants' alleged failure to provide GD treatment.

## B. Purchase of Commissary Items

In her Motion for Partial Summary Judgment, Levy alleges that her commissary order for a hair relaxer kit and eyeliner was rejected. In the body of her original Complaint, Levy nowhere asserts that she has been prevented from purchasing women's items from the commissary or that she seeks injunctive or other relief related to any such claim. Nor was Levy's ability to purchase

such items before this Court on the prior Motions for Summary Judgment. The Court has thus had no occasion to determine whether Levy's pleaded claim extends to allegations about her commissary purchases. Although Levy made no mention of commissary items in the four corners of her Complaint, she did attach to her Complaint her March 2014 ARP in which she asked to be allowed to wear female undergarments, to purchase makeup, and to shave three times a week. *See generally* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Because Levy proceeds *pro se*, her Complaint should be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Even assuming, pursuant to this standard, that Levy has pleaded a claim relating to her inability to purchase women's grooming products from the NBCI commissary, that claim would fail because, as the Correctional Defendants contend, Levy did not exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is an affirmative defense, which is most properly considered on a motion for summary judgment. *See Jones v. Bock*, 549 U.S. 199, 216 (2007).

The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Ross v. Blake*, 136 S.Ct. 1850, 1857 (2016); *Jones*, 549 U.S. at 219. Courts therefore may not excuse an inmate's failure to exhaust. *Ross*, 136 S. Ct. at 1856. This exhaustion requirement serves a valuable function by "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing

litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219. Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

An inmate does not exhaust administrative remedies "simply by failing to follow the required steps so that remedies that once were available to him no longer are." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *Chase v. Peay*, 286 F. Supp. 2d 523, 529-30 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

One way for inmates in Maryland state prisons to present their complaints to prison officials is through the ARP. The ARP has three steps: an initial request for relief from the warden, an appeal of the warden's denial to the Commissioner of Corrections, and an appeal of the Commissioner's denial to the Inmate Grievance Office ("IGO"). Md. Code Regs. 12.07.01.04(B)(9)(a); *Ross*, 136 S.Ct. at 1860. Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. Md. Code Ann., Corr. Servs., § 10-210 (2008).

Here, as Levy does not dispute, she did not complete all of the steps of the grievance process. On March 24, 2014, Levy filed an ARP seeking to be permitted to purchase women's items from the commissary. When that ARP was denied, she appealed to the IGO. The IGO responded to that appeal on December 8, 2014, instructing Levy to provide medical records of her GD diagnosis. However, on November 20, 2014, even before receiving that response from

the IGO, Levy filed this suit. Thus, even if Levy's allegation that she has not been permitted to purchase a hair relaxer kit or eyeliner can be construed as part of her request in her ARP to be allowed to purchase female commissary items, that grievance was not exhausted and therefore cannot proceed in this Court. Alternatively, if considered to be a new grievance based on events occurring after the onset of this case, Levy has not been given permission to amend her Complaint to include those allegations, and there is no evidence that she has exhausted such a grievance through the ARP process. Accordingly, the Correctional Defendants will be granted summary judgment on Levy's commissary claims.

## CONCLUSION

For the foregoing reasons, Levy's Motion to Appoint Counsel is DENIED, her Motion to Amend the Complaint is DENIED, her Motion for a Preliminary Injunction is DENIED, and her Motion for Partial Summary Judgment is DENIED. Wexford's Motion for Summary Judgment is GRANTED, and the Correctional Defendants' Motion for Summary Judgment is GRANTED. A separate Order shall issue.

Date: August 9, 2017

THEODORE D. CHUANG
United States District Judge